Filed 1/13/26  I.H. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| I.H.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY;<br><br>    Respondent.<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G066086<br><br>(Super. Ct. No. 23DP0942, 23DP0943)<br><br>O P I N I O N |

        Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, June Jee An, Judge. Petition for writ of mandate and/or alternative writ denied. Request for stay denied.

Orange County Dependency Lawyers and Gracie Tran for Petitioner.

No appearance by Respondent.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

No appearance by Real Parties in Interest I.H. and I.T.

\*　　　\*　　　\*

I.H. (Father)[1] filed this petition for writ of mandate and/or alternative writ following the juvenile court's order terminating his reunification services pursuant to Welfare and Institutions Code[2] section 366.22, subdivision (a)(1), and setting a termination of parental rights hearing pursuant to section 366.26 (.26 hearing). Father argues there was not substantial evidence to support the juvenile court's findings that returning his two sons, I.H. and I.T. (collectively, children), posed a substantial risk of detriment to them. Father also argues there was not substantial evidence that Orange County Social Services Agency (SSA) provided him with reasonable services.

As to both counts, we disagree. Father lived in Arkansas and had been absent from the children's lives up until the time they were removed from their mother's care. Father did not comply with material aspects of his case plan, specifically failing to do therapy; he also did not demonstrate an

---

[1] Father and one of his sons have the same initials. Further references to I.H. are to Father's son.

[2] All further statutory references are to the Welfare and Institutions Code.

2

ability to meaningfully work with SSA toward reunification. SSA offered Father reasonable services, but Father refused or failed to take advantage of them.

As such, we deny Father's petition for a writ of mandate and/or an alternative writ.

FACTS

In August 2023, the children's mother contacted law enforcement and informed them she had left the children, I.H., who was 10 years old and I.T., who was three, alone for 24 hours, had used cocaine, and did not know where she was.[3] She told police Father lived in Arkansas and had not seen the children for several years.

On September 1, 2023, SSA filed the initial petition which alleged Father had not maintained contact or provided care for the children and that his whereabouts were unknown. On September 5, 2023, the court found the children came within section 300 and detained them from the care of Father.

On September 12 and 20, 2023, SSA spoke with Father who expressed a willingness to reunify with the children. SSA informed Father it was recommending he participate in parent education and individual counseling. As to counseling, SSA asked Father to address the events leading to the petition, past trauma, building a relationship with the children, and barriers that affect parenting. Father initially agreed to participate in recommended services to reunify with the children.

---

[3] Because this petition does not challenge any findings or orders related to the mother, we do not discuss them.

3

On September 27, 2023, SSA filed its Jurisdiction/Disposition Hearing Report, recommending the court declare dependency and order family reunification services to Mother and Father including the recommendations for Father. The court later adopted this recommendation, and, in November 2023, Father pled no contest to the section 300 petition.

Father self-enrolled in parenting school. SSA informed Father that it had set up a counseling referral and gave Father instructions on how to make an appointment.

The children were placed with a resource parent. I.H. reported he was doing great in that placement and that his resource parent loved him and I.T. I.H. did not want to be placed with Father and was initially resistant to conducting virtual visits. But, on November 16, 2023, I.H. and I.T. had a video call with Father which went "amazingly well" and lasted for 90 minutes.

In December 2023, Father completed the parenting course. Father reported the class was beneficial, that he wanted to guide the children, utilize positive reinforcement, and react calmly when they are being difficult. Father worked as a truck driver and changed his routes so he could be home in the afternoon and in the evening.

Father lived in a studio apartment and told SSA the children would stay in the bedroom area, and he would stay in the living room area. On January 22, 2024, the court continued the hearing to February 26, 2024. The February 26th hearing was continued for a six–month review in August 2024 so SSA could assess Father's residence for the children. Father told SSA he was in the process of getting a new place and SSA should list his current address for the assessment.

On March 7, 2024, an Arkansas social worker assessed Father's residence and deemed it not suitable for the children because Father lived in a one–bedroom apartment with his mother and three dogs. Per the social worker, there was "no feasible way to accommodate two children and their belongings." Arkansas would reassess once Father moved into a larger home.

Father informed SSA he had been submitting applications for a three–bedroom apartment, but he had been unable to secure one. Father anticipated moving into a two–bedroom apartment in his same apartment complex.

Regarding therapy, despite a referral for services in Arkansas, as of August 2024, Father had not yet started therapy. Father did not believe he needed therapy. Father also told SSA he did not have the funds for therapy and requested that SSA pay for his therapy.

Father told SSA he had video chats with the children twice a week for 90 minutes. During the calls, I.H. and Father interacted by playing video games, and Father would have short conversations with I.T. due to I.T.'s age.

On August 26, 2024, the court set the matter for a 12–month permanency review hearing. The court found that the father's progress towards alleviating the causes necessitating placement had been moderate and reasonable services had been provided to the Father. Father did not challenge these findings.

In its October 28, 2024, status review report, SSA recommended the termination of reunification services and the setting of a .26 hearing. Father continued to live in the residence which was deemed unsuitable. The children were doing well in their resource parent's care and the resource parent wanted to adopt the children. During this reporting period, SSA noted

that Father's cooperation with the case plans and efforts were minimal. Father had not participated in therapy and continued to state it would be unhelpful.

During the October 2024 reporting period, the resource parent reported that although Father had been consistent with his video visits, he did not always appear to be engaged with the children and instead appeared to be doing other things while he was speaking with them. The resource parent told Father they would be traveling to Tennessee during the summer and invited Father to meet the children there. Father agreed but did not show up.

In December 2024, Father told SSA he secured new housing and planned on moving shortly. SSA requested his new address to conduct a new assessment, but Father failed to provide it.

In January 2025, at I.H.'s request, Father agreed to reduce video visits to once a week. The resource parent explained that although the video visits were important, they generally involved Father and the children sharing the same virtual space without a lot of interaction. According to the resource parent, Father failed to show up for a previously planned meeting in June for I.H.'s birthday and another attempt in August, despite Father only being 30 minutes away. While the resource parent and children were in Texas visiting family, they were able to meet because Father was also visiting family in Texas at the same time. They originally planned to meet on December 29th, but, at the last minute, Father asked to change it to the 27th. However, Father failed to show up despite the resource parent waiting seven hours. Father asked to meet the next day; the resource parent agreed. Father appeared but was 90 minutes late. This was the first time Father met I.T. and the first time he had seen I.H. in six years.

In January 2025, SSA again reached out to Father to obtain Father's new address to conduct an assessment, but Father did not respond.

In an April 2025 report, SSA explained that during visits, Father and I.H. played video games and conversed while playing but that Father usually had the television on. Father was not responsive when I.T. was talking and Father appeared to be distracted. I.H. reported his visits with Father were "okay" but that he wanted to stay in the care of his resource parent and wanted his resource parent to adopt him.

In March 2025, Father informed SSA he had not yet moved to a new residence. Father stated he made a deposit to a landlord that listed the home on Craigslist; Father indicated it was a scam and he lost his money, since there wasn't an actual home to rent. Father again voiced he did not know what to process in therapy and did not have the funds to pay for therapy. SSA recommended Father discuss with the therapist the effects of being away from his children and ways to connect with the children. Father agreed to contact a therapist to schedule an appointment and said he would ask the court to order financial assistance.

In May 2025, SSA reported that Father had been consistent with his weekly video visits but, again, appeared engaged in other activities. That same month, Father reported he found a therapist but had not started therapy. Father told SSA he was waiting to be approved by a leasing office for a three–bedroom home and would hear back by April 30, 2025. SSA requested the address multiple times from Father, but Father never provided it. Notwithstanding, SSA requested continuing an upcoming hearing to assess Father's new home.

In June 2025, Father told SSA he had an intake appointment with a therapist in May 2025. In May 2025, Father also signed his lease

agreement and told SSA he would text them a copy. However, despite SSA requesting a copy multiple times so they could assess his new home, Father never provided it.

The resource parent reported that I.H. wanted to speak to Father on Father's Day so a call was scheduled, but Father never joined. I.H. said he waited 40 minutes for Father, he did not believe Father's excuse for not showing up, and that Father "'always lied to [him].'" The resource parent said the uncertainty of the process was hindering I.H.'s development and identity and that I.H. wanted to remain someplace stable. The resource parent again expressed his love for, and desire to adopt, I.H. and I.T.

On June 27, 2025, Father told SSA he was attending counseling and had his third session scheduled for that day. SSA requested Father sign a release and asked for the therapist's contact information. SSA told Father it was important to have this information so SSA could speak to the therapist to have Father work on goals regarding the case. However, Father did not provide either to SSA. Moreover, despite multiple requests from SSA, as of July 2025, Father still had not provided his new address.

On August 28, 2025, Father told SSA he did not sign a lease but bought a fixer-upper home; however, he was still living at his apartment. Father told SSA he would send the mortgage information and address for the home. Father never did.

On September 30, 2025, the court held a contested and combined 12–month and 18–month permanency hearing. The court accepted SSA's reports into evidence. Father appeared remotely and testified. Father testified he still had not provided SSA with his new address. Regarding housing, he testified that finances were not an issue for him; he just did not want an apartment because that was the same price as a mortgage. He

instead wanted to purchase a house but was getting outbid because he was a first-time home buyer, did not have credit, and did not have enough to put 20 percent down. For the first time at the hearing, Father provided the address.

Following the hearing, the court found pursuant to sections 366.22, subdivision (a), and 366.21, subdivision (f), by a preponderance of the evidence that return of the children to Father would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. The court found that although Father was consistent with his video visits, the children were not engaged during the calls, Father did not make himself available to meet the children, Father consistently failed to provide SSA with his address and therapist's information, and Father consistently did not visit the children.

The court found reasonable services were provided to Father. The court terminated reunification services and set the matter for a termination of parental rights hearing on February 5, 2026.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS A FINDING OF A SUBSTANTIAL RISK OF DETRIMENT IN FATHER'S CARE

At the 18–month permanency review hearing, the juvenile court must return the child to the parent "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) We review an order terminating reunification services for substantial evidence. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021.) "'[O]ur power begins and

9

ends with a determination as to whether there is *any* substantial evidence to support [the trial court's findings]; . . . we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.'" (*Ibid.*)

In the petition, Father primarily argues that SSA failed to meet its burden to show how the children would be at substantial risk if placed in his care. Although the burden below was on SSA, here, we presume the juvenile court was correct, i.e., SSA met its burden. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 ["'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact'"].)

Reviewing the record, we conclude there was substantial evidence to support the juvenile court's findings. A material aspect of Father's reunification services was to attend therapy. However, Father was reluctant to do so and did not claim to begin therapy until four months before the permanency hearing. Father's initial expression to SSA of an inability to pay was belied by his testimony that he did not have financial issues, leading to the conclusion Father was simply unwilling to undergo therapy aimed at reunification.

Another aspect of Father's case plan was to address the reasons leading to the petition. Although Father was consistent with video visits, Father was often distracted. Father failed to show up for scheduled meetings with the children and made little effort to meet them in person. At the time of the hearing, there was little evidence demonstrating Father could provide for the safety and well-being of the children.

10

## II.

### REASONABLE REUNIFICATION SERVICES WERE PROVIDED

Last, Father argues SSA did not provide him with reasonable services towards reunification because "SSA failed to evaluate his housing situation[,] assist[] him in obtaining different housing," and failed to provide him with cost-free therapy. We are not persuaded.

Prior to terminating reunification, the court had to find, by clear and convincing evidence, that SSA offered or provided "reasonable services" to Father. (§ 366.22, subd. (a)(3).) We review this finding for substantial evidence. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 (*Elijah R.*).) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

Regarding housing, SSA worked with Father to assess his housing—it coordinated with Arkansas Social Services to conduct an in-home assessment. When SSA spoke with Father in February 2024, Father said he was in the process of getting a new place and that SSA should just put his current address as the home for the assessment. When Father claimed to

11

have obtained new housing, in May 2025, SSA requested a continuance to evaluate it, but Father never provided the address.

Father argues that when the assessment came back unsuitable, SSA should have provided him with housing referrals or other assistance in obtaining adequate housing. However, Father never requested such assistance. To the contrary, he told SSA he had secured new housing. It would be unreasonable to require SSA to assist Father with housing he already claimed to have secured.

Next, Father claims SSA should have provided him with cost-free therapy. But Father testified that finances were not an issue. Moreover, Father claimed he started therapy, but refused to provide evidence of this. The issue appears to be that Father simply did not want to take part in the therapy services SSA provided. There is nothing SSA can do about that. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414 ["'[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent'"].)

Finally, Father contends SSA should have liberalized his visits and offered to pay for his travels to visit the children in person. Father never made such a request. Again, to the contrary, finances did not appear to be an issue. In any event, Father was presented with opportunities to meet the children in person and did not take advantage of those opportunities. Again, there is nothing SSA can do about that.[4]

---

[4] In the final paragraphs of his petition, Father claims the juvenile court should have "invoke[d] section 352 to extend family reunification services" because extraordinary circumstances warranted such an extension. (§ 352, subd. (b) [hearing cannot be continued "unless the court finds that there are exceptional circumstances requiring a continuance"].) We disregard arguments not set off by their own heading as the California Rules of Court require. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 377–378, fn. 3.) In any event, the

## DISPOSITION

The petition for writ of mandate and/or alternative writ is denied. The request for a stay is similarly denied.

SANCHEZ, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.

---

court found no such circumstances existed and we take no issue with that conclusion.

13